**In the Matter of the ESTATE OF Ben O'Dell CARROLL, Deceased.**

**Gayle Raye JONES, now Carroll, Appellant,**

v.

**William M. CARROLL, Robert J. Carroll, and Richard V. Carroll, Appellees.**

**No. 61271.**

Court of Appeals of Oklahoma, Division No. 4.

Oct. 13, 1987.

As Corrected Jan. 19, 1988.

Rehearing Denied Nov. 2, 1987.

Certiorari Granted for Limited Purposes, Otherwise Certiorari Denied Jan. 19, 1988.

572

James R. Adams, Eufaula, for appellant.

Kenneth W. Lackey, Eufaula, for appellees.

BRIGHTMIRE, Presiding Judge.

Two primary questions emanate from the proceedings below: (1) Does the weight of the evidence clearly support the trial court's finding that testator, Ben O'Dell Carroll, was a single man when he executed his last will on April 5, 1977? and (2) Did the trial court err as a matter of law in holding that a devisee named in the April 1977 will, Gayle Raye Jones, was precluded by 84 O.S.1981 § 114, from taking under the probated will because she later married and divorced the testator?

We answer both questions affirmatively.

I

On April 5, 1977, Ben O'Dell Carroll executed his last will in which he declared, "I am unmarried [and] have had three children ... whose names are: Robert James Carroll; Richard Vance Carroll; and William Michael Carroll." He bequeathed "all horses, horse trailers, saddles, bridles and other tack" which he possessed at the time of his death to Gayle Raye Jones. And, after bequeathing certain personal property to his sons, he devised all of his real estate as follows: An undivided one-half interest to Gayle Raye Jones, and an undivided one-sixth interest to each of the three sons. The testator nominated Jones to serve as executor of his estate and his son William was named as an alternate representative.

In its essentiality, the record discloses that Jones had for quite some time served as a trainer of horses owned by the testator. In time the two people became very close, in fact intimate friends, and though the relationship had its ups and downs the couple had begun sharing the same bed at the time the will was executed. Late in the fall of 1978 the couple agreed to get married. Two days after Christmas, they wed.

After a somewhat stormy marriage they decided to divorce and the union was judicially dissolved in April 1982. The couple's close personal relationship continued, however, much the same as before, marked by a now-and-then living arrangement. Eventually testator moved to an apartment in Tulsa where he died February 18, 1983. The will in question was found among his personal effects in his Tulsa habitation.

One of the testator's sons, William Michael Carroll, the one designated as alternate executor in the will, filed a petition March 28, 1983, asking the court to admit the April 1977 will to probate and appoint him executor, notwithstanding the testator's primary nomination of Gayle Jones. To circumvent the expressed wishes of the testator, and in direct contradiction of his father's explicit testamentary statement, William Carroll alleged that his father and Gayle Jones were married by virtue of a common-law agreement at the time the will was executed and that by statutory law their 1982 divorce operated to revoke the testamentary gifts to Jones.[1]

Gayle Jones intervened in the probate proceeding early on by filing an objection to William Carroll being appointed executor and asked the court to appoint her.

Her objection was heard July 6, 1983. The main issue tried at the hearing, however, was not whether her nomination should be honored but whether a common-law marital status existed between Ben Carroll and Gayle Jones on April 5, 1977—the day the will was executed. Ben Carroll, as we said, had denied it in the will, and Gayle denied it under oath. Petitioner's effort to overcome this with evidence that the amorous couple had entered into a mutual *agreement* to be married, an essential of a common-law marriage, prior to the fall of 1978 fell considerably short of the mark. It consisted primarily of factually unsupported "opinions" of petitioner Carroll and his brother which were not much more than self-serving speculations having little if any probative value.

At the close of the evidence the trial judge correctly concluded that the weight of the evidence clearly required him to find that testator was not married when he executed the will. He proceeded to appoint Jones executrix of Ben's estate, but then turned around and, somewhat paradoxically, announced that Gayle would not be allowed to inherit under the will for the reason that the divorce and the accompanying property settlement somehow had the effect of revoking the testamentary devise to Gayle Jones. While the record does not disclose what the trial judge thought about § 114, it does indicate he was influenced by a District of Columbia circuit court of appeals decision which involved a question of whether a divorced woman could take the "entire estate" of her former husband under the provisions of a will he executed *while married* to the woman. The federal court invoked the common-law doctrine of implied revocation and concluded that the property settlement which accompanied the former wife's divorce was a sufficient change of condition to revoke the will as to her.[2]

In this case a final decree of distribution was eventually entered in accordance with the foregoing legal conclusion and the disinherited devisee appeals naming the three Carroll brothers as appellees. To save the result achieved in the trial court—distribution of the entire estate to themselves—the Carroll brothers cross appeal contending that the evidence established a common-law marriage as of December 1976, a relationship that was not altered, they say, by the ceremonial marriage but it was by the divorce notwithstanding evidence that there was little if any significant change in the

---

1. 84 O.S.1981 § 114 which reads:
    "If, after making a will, the testator is divorced, all provisions in such will in favor of the testator's spouse so divorced are thereby revoked. Annulment of the testator's marriage shall have the same effect as a divorce. Provided, however, this section shall not ap-

ply if the decree of divorce or of annulment is vacated or if the testator remarries his former spouse."

2. *Luff v. Luff,* 359 F.2d 235 (D.C.Cir.1966). We do not consider this case to be either factually or legally relevant to the problems we face here.

postdivorce relationship from what it had been since 1976.

## II

We first consider the contention of the Carroll brothers' cross-appeal—that a common-law marital status existed between Ben and Gayle on the date subject will was executed and the trial court's finding to the contrary is clearly against the weight of the evidence.

■ That the contention has no merit seems manifest simply by virtue of the foregoing review of the evidence. What the cross-appealing Carrolls overlook, we think, is the fact that a man and a woman can fall in love and live together without agreeing to create a marital status. Indeed, it is a common lifestyle nowadays and has been for several years begetting, among other things, post-breakup lawsuits for support irreverently dubbed "palimony." The sine qua non of a common-law marriage is a mutual agreement to be married—a requirement that implies legal recognition that there can exist an unmarried cohabitational status. All of the circumstances surrounding living-together relationships discussed in various cases are often marshalled and placed in evidence to circumstantially prove or corroborate either the existence or nonexistence of an informal nuptial agreement. Disputes about whether such an agreement was made have arisen in a variety of ways and under various situations—between two living people, between the surviving next of kin of a deceased person and a former live-in lover, or for that matter in connection with an IRS-generated problem. In attempting to prove or disprove a common-law marriage agreement, resort must be had to circumstances corroborating one party or the other such as, for example, whether or not the couple has publicly held themselves out as husband and wife.

Here not only do we have both parties to the relationship expressly denying any such agreement, but the undisputed evidence is that Ben Carroll never publicly or privately referred to Gayle as his wife and Gayle never referred to Ben as her husband. There is in fact no substantial evidence of any kind, circumstantial or otherwise, of an agreement between Gayle and Ben to be married until 1978.[3] The main evidence relied on by the Carroll brothers is that which we mentioned earlier—that the parties lived together and that the "opinion" of the Carrolls was that a common-law marital agreement had been made by Gayle and their father prior to April 5, 1977.

In our view, however, the circumstances surrounding the couple's relationship, at least until the formal exchange of vows, are far more consistent with Ben's express testamentary declaration of bachelorhood than with the self-serving speculative opinions of the Carroll brothers.

After examining the evidence in some detail we are of the opinion that the trial court made the only reasonable finding that could be made with regard to the marital status of the parties on April 5, 1977.

## III

■ The contention of Gayle Jones—that since the parties were not married when subject will was executed the devise to her remained valid and unaffected by the later marriage and divorce—has merit.

It presents an issue of first impression and requires an interpretation of § 114—set out in our footnote 1—the statute upon which petitioner Carroll relies to defeat Gayle's devise.

We are of the opinion that the statute pertains only to wills made during the existence of a marriage which provide for or contemplate contemporary spousal inheritance. This inference is drawn from the

---

3. Of significance is evidence that prior to the ceremonial marriage Ben, an employee of the corps of engineers, and Gayle, who held contracts to perform unspecified work for the corps, were very careful to avoid marriage and any public appearance of a man-and-wife relationship in order not to jeopardize the work-related status of either one due to a corps conflict-of-interest proscription.

fact that § 114 deals with the effect of divorce or annulment on one's will—a status-based subject which assumes a marital relationship involving parties who are presumed to be the natural object of each other's bounty when the will is executed. It is in such a circumstance that the consequent intent of the statute comes into play to extinguish spousal inheritance when the relationship giving birth to it is judicially dissolved. And, if § 114 does not apply, we are of the opinion the court is not at liberty to negate the clearly expressed intent of the testator and rewrite "his" last will under the circumstances of this case.

Judging from the strategy employed by the Carroll brothers, they share our appraisal of § 114. As we mentioned earlier William Carroll, in his petition to probate subject will, alleged that Gayle was the common-law wife of his father Ben on the date the latter executed the will. The main subject of the hearing that ensued was Gayle's challenge of this allegation. And, as we have already noted, the Carroll brothers are seeking to protect their trial court victory by means of a cross-appeal featuring one vigorously argued ground—that the "appellee [Carroll] strongly disagrees with the finding" that no common-law marriage existed at the time subject will was executed.

## IV

It is our conclusion, therefore, that the trial court erred in deciding as a matter of law that Gayle Raye Jones' inheritance provided for in the late Ben Carroll's will is precluded.

Consequently the order rendered January 28, 1986, allowing the final account, determining heirship, and decreeing distribution of subject estate is vacated and the cause is remanded with directions to probate decedent's will as written and to grant Gayle Jones such other relief as she may be entitled to by law.

STUBBLEFIELD, J., concurs.

RAPP, J., concurs in part and dissents in part.